421 F.Supp. 1061 (1976)
In the Matter of REGIONAL RAIL REORGANIZATION PROCEEDINGS.
Misc. No. 75-3.
Special Court, Regional Rail Reorganization Act.
May 28, 1976.
*1062 *1063 *1064 *1065 John G. Harkins, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Consolidated Rail Corp.
Wayne S. Kaplan, Covington & Burling, Washington, D. C., for Trustees of Penn Central Transportation Co.
Harry G. Silleck, Jr., Mudge, Rose, Guthrie & Alexander, New York City, for Trustees of the Erie Lackawanna Railway Co.
Stanley Weiss, Newark, N. J., for Trustee of Central Railroad of New Jersey.
Timothy V. Smith, New York City, for Trustee of the Lehigh and Hudson River Railroad.
Jared Roberts, Duane Morris & Heckscher, Philadelphia, Pa., for Trustee of Lehigh Valley Railroad Co.
Howard H. Lewis, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Trustees of the Reading Co.
Vincent E. McGowen, pro se.
Wallace R. Steffen, pro se.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
WISDOM, Judge:
This proceeding before this Special Court relates to the proposed transfer of certain "employee pension benefit plans" to Consolidated Rail Corporation (ConRail) from the Penn Central Trustees, the Erie Lackawanna Trustees, the Lehigh and Hudson Valley Trustees, and the Lehigh Valley Trustee. We hold in favor of the Trustees on all the plans in dispute.
The Regional Rail Revitalization and Regulatory Reform Act of 1976 amended the Regional Rail Reorganization Act of 1973. Newly added § 303(b)(6) of the Act provides that the Special Court shall assure
that the operation and administration of the employee pension benefit plans described in section 505(a) of this Act shall be continued, without termination or interruption, by the Corporation [ConRail] until such time as the Corporation elects to amend or terminate any such plan, in whole or in part; . . .
In accordance with the Court's order of March 18, 1976, each transferor of rail properties submitted to ConRail a list of plans believed by the transferor to be subject to mandatory transfer under § 303(b)(6). The Court directed the parties to meet and agree upon the inclusion or exclusion of each plan. Discussion among the parties helped to limit the area of controversy, and the matter was further clarified at a hearing held on March 31, 1976. An order was entered that same day transferring the disputed plans to ConRail subject to the Court's power to retransmit those plans after consideration of submitted evidence, briefs, and further argument.[1] Having heard such argument on April 19, 1976, we now proceed to exercise our reserved power to review the transfer of the disputed plans, numbering fourteen in all.[2]

I.
Section 303(b)(6) of the Act requires the transfer to ConRail of "the employee pension benefit plans described in section 505(a)". Section 505(a) provides that
A protected employee whose employment is governed by a collective-bargaining agreement will not, except as explicitly provided in this [title], . . . be placed in a worse position with respect to . . . benefits under any employee pension benefit plan in effect on December *1066 1, 1975, other than a plan maintained primarily for the purpose of providing deferred compensation for a select group of management personnel or other highly compensated employees. For purposes of protecting employee pension benefits under this title, the term "protected employee whose employment is governed by a collective-bargaining agreement" includes any beneficiary of, and any participant in, such plan, including noncontract employees. . . .
This statutory description is less than clear. A clue as to its meaning left to us by the drafters of § 505(a) is found in the Report of the Committee of Conference on S. 2718. The Report, at page 211, contains the statement:
"Employee pension benefit plan" is intended to include any plan qualified under Section 401 of the Internal Revenue Code; and any plan, not so qualified, providing retirement benefits in lieu of benefits that would otherwise be provided under such a qualified plan or that constitutes the primary retirement plan for substantially all the employees whose employment is not governed by a collective-bargaining agreement; except that, in no event, shall benefits determined in whole or in part on the basis of service be determined on any basis other than actual service.
ConRail presents three major arguments. First, ConRail asserts, based on its reading of the Report, that an "employee pension benefit plan" for the purposes of § 505(a) is a plan qualified or qualifiable under IRC § 401 and only such a plan. Second, ConRail maintains that protected plans are plans under which at least one active employee is accruing rights. Third, ConRail argues that a pension plan which provides benefits based on prior service of an employee with a railroad other than a transferor is not a plan awarding benefits on the basis of "actual service" as that term is used in the Report. These arguments are now spelled out in more detail.
ConRail relies heavily on the argument that in the absence of a definition of "employee pension benefit plan" in the statute itself, that term should be understood by reference to the Report. The Report does indeed refer to IRC § 401; qualified plans are clearly intended to be protected. The problem, of course, is the meaning of the additional designations in the Report: the "in lieu of" clause and the "primary retirement plan" clause. ConRail suggests that these clauses refer to plans which could be made to qualify under § 401. This description, according to ConRail, fleshes out the statutory language. The statutory exclusion of plans "maintained primarily for the purpose of providing deferred compensation for a select group of management personnel or other highly compensated employees" is assertedly analogous to the exclusions from preferred tax status under IRC § 401(a)[3] of plans which "discriminate in favor of employees who are (A) officers, (B) shareholders, or (C) highly compensated".
ConRail's position with respect to the necessity for a protected plan to cover an active employee is derived primarily from textual analysis of the statute. ConRail points to the statutory phrase "`protected employee whose employment is covered by a collective-bargaining agreement' includes any beneficiary of, and any participant in, such plan . . .". This choice of language is said not to permit the words participant and beneficiary simply to be substituted for the term "protected employee". Arguably supporting this understanding of the term is the Report, at p. 210, which expresses congressional concern for the lack of a provision in the 1973 Act "with respect to preserving such accrued pension rights for the benefit of those rail employees and their beneficiaries not covered by negotiated labor agreements" (ConRail's emphasis). Finally, it is questionable as a policy matter whether ConRail has an obligation to assume responsibility for a pension plan which has entirely wound up except for paying benefits to past employees.
*1067 ConRail's contention that calculation of pension benefits based on prior service with other railroads removes a plan from § 505(a) is based primarily on its view that such a calculation disqualifies the plan for IRC § 401 treatment. The language in the Report with respect to benefits being determined on a basis of actual service also supports this argument.

II.
With respect to all the issues of construction now before this Court, the trustees for the transferor railroads contend that ConRail has ignored the congressional purpose, embodied in the Act, to maintain employee pension benefit plans in the interim period following conveyance and prior to ConRail's determination of the ultimate disposition of those plans.[4] The trustees assert that the "1976 pension amendments . . . evolved against a background of great uncertaintyuncertainty as to whether an uninterrupted flow of pension payments would be left to rest on the unsteady shoulders of the various bankrupt estates, and uncertainty as to what might become of the pension plans themselves. The amendments, in substance, are stop-gap provisions, intended only to require ConRail to maintain the status quo until it decides what should be done with the plans".
Examination of the statute and the legislative history supports the trustees' position. Section 303(b)(6) provides, as previously stated, that ConRail may elect to terminate any transferred plans within one year of transfer. In the event of termination within one year, § 303(b)(6) relieves ConRail of all "liabilities as an employer" under transferred plans "except liabilities . . . under the Employee Retirement Income Security Act of 1974 for benefits accruing during" the time between transfer and termination. Moreover, Congress clearly recognized and was concerned about the fact that certain pension plans, including all but one of the pension plans at issue here, were unfunded. See Report at p. 210. In light of this observation, the drafters of the pension amendments stated that the amendments were
required in order to permit . . . accrued [pension] rights to be preserved to the maximum extent possible, in a manner not inconsistent with the continuing operation of ConRail as a viable railroad. The [amendments] . . . would provide for the transfer to ConRail, as of the conveyance date, of all the rights and obligations of each railroad in reorganization with respect to such pension plans, together with a mechanism that would enable ConRail to fund such shortfall if it should determine to do so, but leaving ConRail free to terminate any or all such plans, in whole or in part, within one year. In the event of complete termination, no liability as an employer would be imposed on ConRail (except certain limited liabilities arising in the intervening period) and the employees of any such plan would be required to look to the assets of such plan, to the trustees of the bankrupt estate and to the Pension Benefit Guarantee Corporation (to the extent any such guarantee is applicable) for the funding of all past service pension benefits accrued as of the conveyance date. Each such plan should, if economically feasible, be preserved, but ConRail, as the post-conveyance employer of the vast majority of covered railroad employees, should have flexibility to determine the extent to which each such plan should be continued, amended or terminated in whole or in part, taking into account such factors as the financial aspects of its own *1068 operations, available funding sources, and its overall employment policies.
(Emphasis added.)
This is a clear exposition of the purpose of the pension amendments. The amendments were meant to require continuation of non-agreement pension plans until ConRail could decide, in light of many factors, some of which would be uncertain at the time of conveyance, what ought to be done with such plans. Thus, as the trustees point out, ConRail was "assigned a planning role . . . without financial risk to itself with respect to the pre-conveyance liabilities under the plans".
Given this flexibility and this protection from pre-conveyance liabilities in the event of termination and given the fact that Congress, in § 211(h) of the Act,[5] has in fact provided funding for the pre-conveyance liabilities of unfunded transferred pension plans, the question arises as to why ConRail has vigorously contended that the plans involved here should not be transferred. During oral argument, the Presiding Judge put this question to counsel for ConRail. No convincing answer was forthcoming; counsel in response and in brief pointed to the limited resources of ConRail. ConRail may have an understandable reluctance to accept the responsibility for terminating these plans because of the detrimental effect such termination may have on the morale of affected employees now working for ConRail.[6] It is not clear to us, however, how that morale could be bolstered by ConRail's refusal, in the first instance, to accept the transfer of plans ultimately to be terminated. This refusal, for practical purposes, would probably result in the termination of such plans by the transferor railroads in reorganization. Although there may be some dispute as to the cash-flow positions of the bankrupt estates, it cannot seriously be contended that these estates would be in a better position than ConRail to maintain a continuous flow of payments under the unfunded plans. Perhaps a significant reason for ConRail's dissatisfaction with initial transfer of plans it intends to terminate is the administrative burden of termination. Again, the extent of that burden is conjectural. Nevertheless, to the extent there is a burden, the trustees correctly point out that ConRail, having acquired most of the employees of the railroads in reorganization, is in the best, perhaps the only, position to shoulder that burden.
ConRail's final objection, on policy grounds, to acceptance of the pension plans is that serious adverse tax consequences will befall the beneficiaries of such plans. ConRail contends that it will be forced to fund these programs by a § 211(h) loan from the United States Railway Association. This, in turn, ConRail argues, will be construed by the IRS as payment to employees, and, since none of these plans is protected by IRC § 401(a), the employees will be obligated to pay the income tax on the total actuarial value of the plan, rather than be allowed to account for income in the year actually received. Besides the initial unexpected tax burden, ConRail points to the fact that those employees who die early will never receive the benefits for which they already paid taxes.
This Court has received letters from beneficiaries of the questioned pension plans; in no case has the Court been urged to prevent transfer of the plans in light of tax consequences. More importantly, it is clear that the pension amendments did not intend *1069 for such serious tax consequences to flow from transfer of pension plans to ConRail. It seems to us unlikely, therefore, that the Commissioner of Internal Revenue will seek to tax this unexpected income, and the trustees have suggested that there may be ways of structuring the transaction to avoid the burden. In any case, ConRail, if it cannot arrange for funding of transferred plans without foisting upon its employees a huge tax liability, may still terminate transferred plans. The argument based on tax consequences is, therefore, inconclusive.
This discussion of policy and practicalities should not, of course, cause this Court to order the transfer of plans clearly excluded by § 505(a), nor do the trustees contend that every pension plan in existence at the time of conveyance should have been transferred.[7] But consideration of the policy and practicalities involved suggests strongly that if the statutory language can be reasonably construed to require transfer of a pension plan that plan must in fact be transferred.[8]

III.
In attempting to establish the correct meaning of "employee pension benefit plan", both the transferor railroads and ConRail refer to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq. For example, the trustees suggest that the definition of "employee pension benefit plan" given in 29 U.S.C. § 1002(2) was "almost surely" intended by Congress to apply to § 505(a) of the Act.[9] ERISA defines such plans as
any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program 
(A) provides retirement income to employees, or
(B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.
The trustees admit, however, that the Report does not refer to ERISA in this regard and that the "in lieu of" portion of the Report's definition is not clarified elsewhere. By reference to the arguably common goals of the pension amendments and ERISA, the trustees seek, however, to have a broad definition of "employee pension benefit plan" incorporated into the Act. This commonality is seen as the employee protection purposes of both ERISA and the pension amendments, ERISA attempting to protect against misuse of pension funds and the pension amendments attempting to prevent premature and disorderly termination of pension plans.
ConRail, on the other hand, asserts, for example, that two Penn Central Plans (Plans 1 and 2, Part B, Addendum 1) are not pension plans at all, but welfare plans. ERISA § 3(1), 29 U.S.C. § 1002(1), is relied upon for this distinction. ERISA defines a welfare plan as any plan that is

*1070 maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . benefits in the event of . . unemployment. ...
The pension plans said to fall within this definition are plans providing for early retirement, which pay benefits up to the normal time of retirement, when regular pension benefits can begin. More importantly, ConRail asserts that the exclusions from ERISA protection in, for example, 29 U.S.C. § 1051(2) should be construed to exclude nonqualifiable plans under IRC standards and that this exclusion also requires the exclusion of similar nonqualified plans for purposes of the pension amendments.
The arguments based on the incorporation of ERISA standards into the Act are inconclusive and, were they to be relied upon, would force this Court to construe ERISA before it is clearly necessary to do so. Just as Congress, if it had intended to do so, could have by direct reference to the IRC in § 505(a) eliminated problems of construing its intention, it could also have referred to ERISA for purposes of defining an "employee pension benefit plan". That the statute refers to neither for this purpose suggests that no statutory definition should be imported and that the Act should be interpreted according to its unique purposes. We decline, therefore, the invitation to construe ERISA and rely solely upon the purposes of the pension amendments themselves in reaching a decision.
Turning, then, to ConRail's interpretation of the definition provided in the Report, we note that ConRail's interpretation does not adequately explain that definition. There is, first, no statutory basis for the distinction between "pension" and "welfare" plans. The most significant problem, however, is that ConRail's reading requires us to draw a distinction between plans which are qualified under the IRC and plans which are merely qualifiable under the IRC. In the absence of this distinction, the "in lieu of" clause would have no purpose in ConRail's understanding. The so-called distinction is not supported by the IRC. The language of § 401(a) itself provides that a pension plan meeting the statutory definition "shall constitute a qualified trust". (Emphasis added.) Nor has it been shown that a pension plan meeting the applicable requirements of § 401 is yet "unqualified" until the receipt of a formal determination letter from the Internal Revenue Service confirming the plan's qualified status. Finally, ConRail has not shown or explained how some IRC nonqualified plans could be made to qualify  and are, hence, qualifiable  whereas other nonqualified plans could not be so modified. Again, there appears no basis for the distinction between "qualified" and "qualifiable".
Even if ConRail could show, however, that such a distinction existed, ConRail has not explained why IRC standards should be synonymous with pension amendment standards, especially in light of the third part of the definition provided in the Report. The Report includes within the definition of "employee pension benefit plan" those plans that are not qualified under the IRC but which "constitute . . . the primary retirement plan for substantially all the employees whose employment is not governed by a collective bargaining agreement". It is clear that a plan providing for retirement benefits for substantially all noncontract employees is a plan which might, because of its discriminatory tilt, be unqualified under IRC § 401(a). If Congress had intended § 505(a) of the Act to protect only qualified plans, the language of the Report is inexplicable. In short, if the Report is to be relied upon, it belies the congressional intent suggested by ConRail. Of course, the trustees' interpretation of the "in lieu of" clause  covering pension plans as long as they are not duplicative of benefits conferred under a qualified plan  also leaves something to be desired. Under that reading, the provision for plans covering substantially all noncontract employees seems somewhat superfluous. Another reading of the statute would equate the "in lieu of" clause and the clause pertaining to noncontract employees, but would emphasize the latter aspect. In *1071 that case, the "in lieu of" clause becomes superfluous. The best, if somewhat unsatisfactory, conclusion that can be drawn with reference to the Report is that it is ambiguous. Again, the ambiguity suggests that we decide this case, not by analysis of congressional comments, but by reference to the purposes of the Act. In light of the statutory purpose of providing interim protection for pension plan beneficiaries pending ConRail's decision as to what should be done, we conclude that ConRail's suggestions with respect to tax qualification under § 401 of the Internal Revenue Code must be rejected.
Similarly, we reject ConRail's arguments with respect to the need for an active employee and with respect to benefits based on inclusion of actual prior service with railroads other than the transferor.
As to the need for an active employee, we note first that § 102(8) of the Act requires, if the context permits, that "`includes' and variants thereof . . . be read as if the phrase `but is not limited to' were also set forth." The most, indeed only, sensible reading of § 505(a) is that the sentence in question was intended to expand the definition of protected employee to include retirees, other beneficiaries, and noncontract employees, an expansion clearly contemplated by the Report. Pension benefits are typically paid to inactive employees. Section 505(a)'s protections would be partially illusory if ConRail were required to maintain pension plans only so long as they protect active employees. ConRail's argument that it has no interest in maintaining a pension program solely for retired employees is likewise unconvincing. First, the discontinuation of such programs might affect the morale of active and future employees. See Tate v. New York, N.H. & H.R.R., 2 Cir. 1964, 332 F.2d 449, 452. Second, ConRail cannot seriously suggest that there is any real difference in terms of its interests between plans covering, for example, one active employee and plans covering no active employees. Third, Congress intended to protect, "to the maximum extent feasible", the worker and not ConRail. The automatic exclusion of programs without active employees can hardly be thought of as protection to the maximum extent feasible.
Finally, with respect to the constructive service question, ConRail's IRC qualification theory has already been dismissed, and there is no other possible basis in the statute or the Report for exclusion of plans paying benefits for actual, prior service with railroads not involved in the present transfer. The Report, indeed, seems to support the trustees' argument instead. Prior service credit in the calculation of pension benefits is the usual practice in the railroad industry. See Tate, 332 F.2d at 452. Just as the railroads themselves are physically joined so that one end of the country is linked by rail to the other, rail employees are joined in a common enterprise  the national railroad system. Experience acquired with one railroad is largely interchangeable with experience acquired with another, and, in taking into consideration prior service for pension purposes, the railroads have refused to inhibit transfers of employees when it was necessary to draw upon such experience. This practice is well known, and the most reasonable construction of congressional intent is, therefore, a construction that provides protection of plans paying benefits based on prior actual service regardless of the railroad where that service was rendered.
We discuss now each of the disputed pension plans[10] and apply the legal conclusions reached above.

*1072 IV.
Two disputed plans are readily seen as transferable without further discussion. These are Plans 3 and 14 (originally omitted from Part B of Addendum 1) to which ConRail objected solely on the ground that they do not provide coverage for current employees. We have shown that coverage of current employees is not a prerequisite to § 505(a) protection.
Plan 4 in Part B is objected to in part because it provides additional payments upon retirement to employees who had Canadian service which, for administrative reasons, was not credited under the main Penn Central plan. Such benefits, according to ConRail, do not fit into the "in lieu of" category of protected plans unless they provide the employee's principal retirement benefits. This reading of the "in lieu of" clause is unduly restrictive. If the Penn Central trustees' uncontested factual statement is correct, the employees covered by this plan are receiving benefits which make up the difference between Penn Central benefits they are receiving and Penn Central benefits they would have received in the absence of administrative rearrangement. These benefits easily fall, therefore, into the "in lieu of" category. Since the only further objection on ConRail's part is the unqualified nature of this plan for tax purposes, an objection in which we find no merit, the plan is transferable.
ConRail poses another "in lieu of" clause objection to Plan 2, and a similar objection could be made to Plan 1. Plan 2 provides for life benefits for early retirees and was apparently intended to allow such retirement without impairment to the amount of benefits that would have been received had the employees been allowed to work to the usual retirement age. The plan therefore provides benefits "in addition to" benefits payable under the regular, tax-qualified plans. If the "in lieu of" clause is construed to exclude all "in addition to" plans, these plans are not protected by § 505(a). No good reason appears, however, for so construing the statute. First, the language of the statute itself does not support any distinction such as ConRail would have this court make. Moreover, ConRail apparently desires us to read the "in lieu of" clause as protecting only those plans that pay benefits when payable benefits under a qualified plan were somehow stopped and replaced. The clause can just as easily be construed to protect plans paying benefits because payment under a regular plan would, for any reason, e. g., because of early retirement, be less than the employer and employee originally expected. Again we determine that ambiguity in the Report should, in light of congressional intent, be construed in favor of transfer. ConRail's "in lieu of" objections are rejected.
Before Plan 2 or any of the other plans (other than Plans 3, 4 and 14) can be deemed transferable, this Court must in each case decide a factual issue: is the plan one that provides "deferred compensation for a select group of management personnel or other highly compensated employees"? Before we enter that factual swamp, a preliminary *1073 observation should be made. This Court must determine which party has the burden of proof, and, because allocation of this burden will have a great impact on the results of this litigation, it is not a task that can be done without reflection. Although the parties have not explicitly argued this question, ConRail's discussion of some of the plans reflects its understanding that the burden is on the transferor railroads and not ConRail. No arguments were given, however, in support of this understanding, and it is an understanding we do not share.
Our decision is based upon the circumstance that ConRail's position, in view of what we consider to be the congressional purpose in protecting all those employees and beneficiaries of the bankrupt railroads who were unlikely to be financially secure without pension aid, is "disfavored". See C. Clark, Code Pleading § 96, at 210 (2d ed. 1947); J. McCormick, Handbook on the Law of Evidence § 337, at 786-87 (2d ed. E. Cleary 1972); cf. 88 Harv.L.Rev. 1610, 1618 (1975). ConRail would require the Court to draw fine distinctions where Congress obviously desired to provide broad protection; ConRail seeks to protect itself against all adverse repercussions where Congress obviously wanted ConRail to make an effort to preserve plans, or at least consider the preservation of plans, of great importance to the average worker or beneficiary.
We are not unaware of the substantial interests on ConRail's side of the equation. The major purpose of the Act is to strengthen the rail transportation capacity of the Northeast in the interest of the national economy. It would be unrealistic to assume that Congress, in making its gargantuan effort, planted the seeds of that effort's destruction by forcing ConRail to accept pension liabilities that would prevent it from becoming a self-sustaining enterprise. But we do not have to make that assumption to decide this case. There has been no convincing showing that interim acceptance of the pension plans at issue would seriously impair ConRail's current operation or jeopardize its chances for ultimate success. Instead, the convincing showing has been that a major unfairness would result if the average employee or beneficiary were to suffer needlessly as a result of Congress' reorganizing and streamlining the Northeast rail system. Had Congress itself decided that some rail employees' pension interests must suffer for the good of the nation as a whole, we would be faced with a different problem. Congress left this decision, however, to ConRail and gave ConRail a year to make it. ConRail, whatever else it may be, is a governmental creation. It must face up to certain responsibilities resulting from this special status, even if good business sense suggests that those responsibilities be avoided. In short, we place the burden of proof on ConRail because we believe it more important to save plans arguably protected by the Act than to spare ConRail the risks of accepting those plans.
We turn, then, to consideration of the remaining plans.
With respect to Plan 1, the plan covering by far the largest number of employees and involving the most money, Penn Central has filed with this Court a printout of all employees covered by that plan. ConRail has analyzed the data in an attempt to show that the plan provides protection for a select group of management personnel and other highly compensated employees. See Alexander Affidavit, Exhibit 13. This analysis shows, first, that 60 percent of the non-agreement employees do not fall into the categories of president, vice-president, treasurer, secretary, controller, assistant vice-president, general manager, sub-department head "and all other Officers". This refutes for us the possibility that the covered employees are a "select" group of management personnel. Moreover, Exhibit 14 of that affidavit reveals that the average compensation of the employees in this plan, at the time of retirement, was about $14,625. ConRail has not convinced this Court that employees in this salary range were thought by Congress so "highly compensated" that they were meant to be excluded from the protection of the pension amendments. Although *1074 comparable factual data are not available for Plan 2, it has been treated by the parties as similar to Plan 1[11] and we treat it as such here. Plans 1 and 2 are transferable under § 505(a).
ConRail has not shown to our satisfaction that Plan 12, which pays benefits to one retiree, is not protected by § 505(a). First, it appears that ConRail's major objection to this plan is that it does not cover any active employees. This is an objection that we have shown to be without merit. Second, ConRail seems to be objecting to this plan on the ground that it is not a pension at all, but a "separation allowance". This is a distinction to which we are unwilling to give substantial weight. Plan 12 is, therefore, transferable.
The other plans at issue present somewhat more difficult problems. First, the average annual compensation at the time of retirement or at present is substantially higher than the average for those plans previously discussed.[12] Second, an argument could be made, especially with respect to Plan 11 (which provides benefits to some early retirees or their widows), that a "plan", as that term is usually understood, never really existed or that if there was a plan, it was so ad hoc as to constitute a plan for "a select group".
Plans 7, 9 and 10 are plans which pay supplemental benefits, based on prior service with other railroads, to former employees of the Erie Lackawanna or the Delaware, Lackawanna and Western Railroad Company (DL&W), which merged with the Erie Railroad in 1960 to form Erie Lackawanna. The Erie Lackawanna funded plan did not provide for prior service pension benefits. Plan 7 apparently continued DL&W's practice of crediting retirees' service before beginning work with DL&W. Plan 9 has the same purpose; the only difference seems to be that the covered employees had not retired at the time of the merger. Plan 10 provides pension benefits based on prior service with other railroads to employees who joined Erie Lackawanna since the merger and who were induced, in part, to accept employment with Erie Lackawanna by the promise that previously accrued pension rights would not be jeopardized.
With respect to these plans, we reject ConRail's contention that these are not actually "plans" or that the plans cover only a select group of employees. To prove that any of these programs is not a "plan", ConRail would have had to have shown that similarly situated employees did not receive similar consideration. The two programs covering pre-DL&W service probably applied with equal measure to all former DL&W employees at the time of merger, and the program for post-1960 new Erie Lackawanna employees also seems to be the product of uniform policy of the Erie Lackawanna Board of Trustees rather than the result of whimsical action. Similarly, without more evidence that the covered employees were "select" in the sense that they were uniformly among the corporate elite this Court cannot in good conscience assume that Congress did not mean to protect them. Instead, the covered employees appear to be, for the most part, what may be termed "middle management". If the statutory exclusion had been meant to apply to this type of employee, the word "select" is superfluous or misplaced.
We also reject the possibility that these plans were designed to provide benefits for a "select" group of highly compensated employees. Two of the five employees covered by Plan 7, for example, earned less than $10,000 at the time of their retirement. *1075 Although these retirements occurred in the late 1950's, when $10,000 was worth more than it is now, this category of employee is not so financially secure that we should conclude that Congress did not want ConRail to attempt to continue pension benefits without impairment. Plans 9 and 10, at the lower end of their spectra, cover employees making about $20,472 in 1972 and $21,372 at present. Even if these salaries are high in comparison with the average salary paid to railroad employees, it is not clear that Congress wanted this comparison used as a standard. Because ConRail has the power to amend as well as terminate, and thus is not locked into the details of these plans, and because ConRail bears the risk of nonpersuasion, we hold that these plans, too, should be transferred.
We come to Plan 11. This plan covers four early retirees and two widows of Erie Lackawanna employees. The retirees, who were paid as "consultants" until usual retirement age and are paid supplemental pension benefits after that age, were relieved from active employment apparently because of physical illness. We would have some difficulty in categorizing their benefits, considered by themselves, as part of a "plan." However, ConRail's own analysis of these provisions is that they were in fact "a prior version of the early retirement policy" later regularized as Plan 8 (Exhibit 12, Alexander Affidavit), which, we note, ConRail has not objected to taking over. In the overall context, then, we think that these arrangements should be considered part of an "employee pension benefit plan" for present purposes. Similarly, when considered in tandem with Plan 8, we do not think that the resultant policy was "maintained primarily for the purpose of providing deferred compensation to a select group of management personnel or other highly compensated employees." Too many of these employees fell into what can only be considered a non-select group. Accordingly, we conclude that this plan should be transferred to ConRail.
Finally, we come to plan 13. The Trustee of the Lehigh Valley asserts that this plan "should rise or fall" with various other plans we have already considered, and from our review of the evidence that has been submitted that seems to us to be correct. Indeed, at oral argument, counsel for ConRail indicated that he was ready to treat this plan on the merits, although it had just been added to the list, and during the course of argument counsel indicated no special objection to this plan. If there were special objection, it would be ConRail's duty to have brought it before us. Accordingly, we think that our ruling that the other plans we have considered should be transferred is here dispositive, and this plan is also to be included.

* * *
We reemphasize ConRail's flexibility with respect to the continuation or termination of these benefits. The statute provides that ConRail may amend or terminate transferred plans within one year of transfer, that ConRail, if it terminates a plan, will not be liable for pre-conveyance liabilities of that plan, and that ConRail is authorized to borrow money, for the payment of pre-conveyance liabilities, from the United States Railway Association. If the repayment of such loans threatens ConRail's well-being, the loans may be forgiven. Finally, we suggest that the burden on ConRail arising from temporary acceptance of these plans is miniscule. In light of these factors, and in light of our belief that Congress intended maximum security for pensions and would have provided for the protection of the disputed plans if it had specifically considered them, we hold that transfer of all of the plans would best comport with the dictates of the pension amendments.
NOTES
[1] We have also had petitions asking us to exercise our reserved power to modify or amend the terms of the Order or Addendum No. 2. We have been advised that the parties are working toward an agreement that may solve these disputes, and accordingly we now make no rulings on these matters.
[2] Twelve plans were listed in Part B of Addendum 1 of the Order of March 31. Two additional plans have been added by further orders of this Court dated April 16 and 19, 1976. The plans are listed and numbered in note 10 infra.

We note here that, during oral argument, ConRail agreed to accept Plans 5, 6, and 8. We do not discuss, therefore, the transferability of those plans under § 303(b)(6).
The United States and the United States Railway Association do not appear to have taken positions with respect to the present dispute.
[3] 26 U.S.C. § 401(a).
[4] See A. Sutherland, 2A Statutory Construction §§ 45.02, at 5, 45.05, at 15 (4th ed. 1973):

Before the true meaning of a statute can be determined where there is genuine uncertainty as to how it should apply, consideration must be given to the problem in society to which the legislature addressed itself, prior legislative consideration of the problem, the legislative history of the statute under litigation, and the operation and administration of the statute prior to litigation.
. . . . .
For the interpretation of statutes, "intent of the legislature" is the criterion, or test, that is most often recited.
[5] Section 211(h) provides, in pertinent part:

(1) The [United States Railway] Association is authorized . . . to enter into loan agreements, in amounts not to exceed $230,000,000 in the aggregate, with the Corporation [ConRail] . . . to meet existing . . . obligations of the railroads in reorganization . . . [including] amounts required for adequate funding of accrued pension benefits existing at the time of a conveyance or discontinuance of service under employee pension benefit plans described in section 505(a) of this Act. . . .
To the extent that § 211(h) funds are so used, ConRail will "have a direct claim, as a current expense of administration, for reimbursement from the estate of a railroad in reorganization" for the obligations so met. § 211(h)(4)(C). The Association may, in certain circumstances, forgive the loan to ConRail. § 211(h)(6).
[6] It appears that only one plan, Plan 10, covers active employees.
[7] There was agreement, for example, that some plans could not be transferred under the statute. These plans covered employees whose monthly salaries ranged from about $2,000 to $15,000.
[8] Cf. 3 A. Sutherland, supra, note 2, § 71.09, at 353-54:

Statutes granting pensions to . . . public employees, were enacted to stimulate governmental efficiency by encouraging continued and loyal public service, . . . [T]his type of legislation . . . has as its purpose the promotion of the general welfare, and for that reason pension statutes are liberally construed to accomplish that objective. Thus in determining the beneficiaries entitled to pensions, the eligibility of the pensioner, and the time of service required for obtaining a pension, the courts eschew resort to technicalities. ...
[9] This argument is buttressed by ERISA's use of similar language of exclusion. See, e. g., ERISA §§ 201(2), 301(a)(3), 29 U.S.C. §§ 1051(2), 1081(a)(3).
[10] The plans, referred to in text by their numbers, are named as follows:

Plan 1  Policy of Interim Pensions, Penn Central Transp. Co., of Feb. 1, 1968 (established March 1, 1963 by Pennsylvania R.R.)
Plan 2  Policy of Interim Pensions, Penn Central Transp. Co., of Feb. 1, 1968 (established May 28, 1959 by New York C.R.R.)
Plan 3  Plan for Supplemental Pensions, Penn Central Transp. Co., of Jan. 1, 1969 (established Jan. 31, 1951, by New York, N.H. & H.R.R., as amended to Oct. 25, 1961)
Plan 4  Plan for Additional Pension Allowances for Employees in Canada, Penn Central Transp. Co., of Apr. 25, 1968, as amended to Feb. 3, 1972
Plan 5  The Delaware, L. & W.R.R. Pension Plan (eff. Oct. 1, 1941)
Plan 6  The Delaware, L. & W.R.R. Unfunded Pension Plan (eff. Jan. 1, 1956)
Plan 7  The Delaware, L. & W.R.R. Funded Pension Plan (eff. Jan. 1, 1956)
Plan 8  Early Retirement Policy, approved by Erie Lackawanna Ry. Bd. of Directors (eff. July 1, 1971)
Plan 9  Erie Lackawanna Bd. of Directors' res. adopted Oct. 17, 1960, providing credit for prior railroad service to named officers and employees of DL&W in accordance with provisions of plan identified as No. 7 above
Plan 10  Erie Lackawanna Bd. of Directors' and Trustees' res. providing credit for prior railroad service to certain officers and employees in connection with their becoming employed
Plan 11  Pension provisions made at various times by Erie Lackawanna for specific officers, employees, or widows
Plan 12  Lehigh and Hudson Policy of Interim Pensions adopted Nov. 17, 1966
Plan 13  Lehigh Valley R.R. (eff. June 1, 1944) [added by order of Apr. 19, 1976]
Plan 14  Lehigh and Hudson Supplemental Pension Plan for Official and Supervisory Personnel, dated Feb. 1, 1956 [This plan was erroneously omitted from the original Part B and was replaced there by a supplemental order of this Court.]
[11] ConRail itself has suggested that Plan 2 would reflect a pattern of alleged discrimination in favor of management or highly compensated employees similar to that of Plan 1. ConRail's Brief at 24.
[12] Rough averages are as follows:

 Plan 7 $20,615
 Plan 9 $24,930
 Plan 10 $30,025
 Plan 11
 (early retirees) $25,270
 (employees whose
 widows were awarded
 special benefits) (not available)