**UNITED STATES of America,**

v.

**Duverny MEDINA, Defendant.**

**No. CRIM. 98–CR–10041–NG.**

United States District Court, D. Massachusetts.

Jan. 13, 1999.

---

William H. Keefe, Jamaica Plain, MA, for Defendant.

Kevin McGrath, Asst. U.S. Atty., United States Atty's Office, Boston, Ma, for U.S.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

Defendant Duverney Medina ("Medina") moves to suppress the testimony of a cooperating witness ("CW"). Medina argues that the benefits the government gave the CW—a substantial amount of money, assistance with tax and immigration problems, as well as limited immunity, dropped charges, and the promise of leniency— violate the federal bribery and gratuity statute, 18 U.S.C. § 201(c)(2).[1] Section

1. Defendant also argues that the government's giving things of value to the CW violates Massachusetts Supreme Judicial Court Rules, Prosecutorial Function 4, and M.G.L. c. 268A § 3(c). Prosecutorial Function 4 holds that "[i]t is unprofessional conduct to compensate a witness, other than an expert for giving testimony...." But it makes exceptions that parallel those in the federal law, for paying for expenses or paying to relocate a witness for his or her safety. M.G.L. c. 268A § 3(c) is a nearly verbatim state equivalent to 18 U.S.C. § 201(c)(2). Since these statutes

201(c)(2) prohibits giving a person "anything of value" "for or because of testimony."[2] Following the reasoning announced in *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998) (*"Singleton I"*) rev'd en banc 165 F.3d 1297 (10th Cir.1999) (*"Singleton II"*), Medina argues that the proper response to the government's violation of § 201(c)(2) is the suppression of the CW's testimony.

The *Singleton I* panel, in a novel decision, held that prosecutors, like defense lawyers, and indeed all citizens, are bound by § 201(c)(2). Furthermore, the panel held that a central part of the prosecutor's arsenal, the ability to move for a downward departure under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 in exchange for a promise to testify, violates § 201(c)(2).[3]

Not surprisingly, *Singleton I* has been the subject of a firestorm of controversy, challenging as it does the longstanding and deeply ingrained prosecutorial practice of exchanging leniency for testimony. While that practice is unquestionably important, *Singleton I* raised even more profound questions: To what extent are government lawyers obliged to follow the same rules as defense lawyers?[4] If 18 U.S.C. § 201(c)(2) represents Congress' abiding concern that giving witnesses benefits "for or because of their testimony" runs the risk of tainting their testimony, why should prosecutors be excluded?[5] More broadly, have prosecutors, by depending so heavily on immunized testimony and cooperation-for-leniency deals, *de facto* converted ours from an accusatorial system, in which the government bears the burden of proving the guilt of a defendant beyond a reasonable doubt, into an inquisitorial system, in which the government obtains confessions by threatening to use at trial the testimony of those with whom it has struck deals?[6]

The response to *Singleton I* of the overwhelming number of courts around the country has been negative. Just over six

---

parallel the federal code, my discussion will remain focused on the federal law question.

2. 18 U.S.C. § 201(c)(2), states in relevant part:

   Whoever ... directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court ... shall be fined under this title or imprisoned for not more than two years, or both.

3. Ms. Sonya Singleton ("Singleton") was convicted of one count of conspiracy to distribute cocaine and seven counts of money laundering. She argued on appeal that the district court erred by denying her motion to suppress the testimony of Napoleon Douglas ("Douglas"), a coconspirator who had entered into a plea agreement in which the government promised not to prosecute him for certain charges and to advise the sentencing court of the extent of his cooperation if he provided substantial assistance. The *Singleton I* panel held that Singleton's motion to suppress should have been granted and that the error was not harmless, but declined to overturn her conviction because the other evidence was sufficient to sustain it.

4. Within months of the decision, a new federal "Citizens Protection Act," 28 U.S.C. § 530B was passed (due to take effect on April 20, 1999). The Act binds federal prosecutors to respect the same code of ethics that applies to all other lawyers in the state in which they appear.

5. As the Court in *Singleton* put it: "The antigratuity provision of Section 201(c)(2) indicates Congress' belief that justice is undermined by the giving, offering or promising anything of value for testimony. If justice is perverted when a criminal defendant seeks to buy testimony from a witness, it is no less perverted when the government does so." 144 F.3d at 1344–45.

6. As the Supreme Court said in *Rogers v. Richmond,* 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961): "[O]urs is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." (*Rogers* grounded this principle on the Due Process Clause.)

months after handing down *Singleton I,* the Tenth Circuit, sitting en banc, reversed the decision in *Singleton II.* Moreover, with the exception of two district courts,[7] *Singleton I* has been rejected by every court in which the issue has been raised.[8]

In this Circuit, issues concerning the application of § 201(c)(2) to the behavior of prosecutors are issues of first impression.[9] Indeed, these questions are especially significant in the case before me.[10] Unlike the other cases in which claims under § 201(c)(2) have been raised, this case is not only about immunity, the promise of non-prosecution and a motion for leniency, but also about cash payments to the CW totaling over $105,000. In addition, notwithstanding the payments, the CW was permitted to live in subsidized housing and receive benefits for her children. Finally, although a deportable alien,[11] she received immigration assistance for herself, as well as members of her family, not to mention professional assistance in dealing with her outstanding tax liability.

I find that deals for immunity, leniency, and non-prosecution in exchange for testimony are exempt from coverage under § 201(c)(2). But the fact that there are some exceptions to § 201(c)(2)'s general prohibition does not mean that prosecutors are not covered at all, as some of the courts rejecting *Singleton I* have suggested.[12]

**7.** The only published opinions to follow *Singleton* are *United States v. Fraguela,* 1998 WL 560352 (E.D.La. Aug.27, 1998); and *United States v. Lowery,* 15 F.Supp.2d 1348 (S.D.Fla. 1998).

**8.** So far, two circuits, outside of the Tenth, have reviewed and rejected the reasoning in *Singleton I: United States v. Haese,* 162 F.3d 359 (5th Cir.1998); and *United States v. Ware, Jr.,* 161 F.3d 414 (6th Cir.1998). The following district courts have also rejected the reasoning in *Singleton,* focusing only on the question of whether plea agreements can violate § 201(c)(2): *Wainsworth Marcellus Hall v. United States,* 30 F.Supp.2d 883 (E.D.Va. 1998); *United States v. Clark,* 29 F.Supp.2d 869 (S.D.Ohio 1998); *United States v. Abraham,* 29 F.Supp.2d 206 (D.N.J.1998); *United States v. Masciandaro,* 1998 WL 814637 (S.D.N.Y. Nov.19, 1998); *United States v. Cantu,* 1998 WL 842334 (D.Kan. Nov.9, 1998); *United States v. Crumpton,* 23 F.Supp.2d 1218 (D.Colo.1998); *Nero v. United States,* 1998 WL 744031 (E.D.Pa. Oct.23, 1998); *United States v. White,* 27 F.Supp.2d 646 (E.D.N.C.1998); *United States v. Nieves,* 1998 WL 740835 (D.Conn. Oct.13, 1998); *United States v. Hammer,* 25 F.Supp.2d 518 (M.D.Pa.1998); *United States v. Revis,* 22 F.Supp.2d. 1242 (N.D.Okla.1998); *United States v. Laureano,* 1998 WL 696006 (S.D.N.Y. Oct.7, 1998); *Cancel–Hernandez v. United States,* 1998 WL 846824 (E.D.N.Y. Oct.5, 1998); *United States v. Szur,* 1998 WL 661484 (S.D.N.Y. Sept.24, 1998); *United States v. Mejia,* 1998 WL 598098 (S.D.N.Y. Sept.8, 1998); *United States v. Barbaro,* 1998 WL 556152 (S.D.N.Y. Sept.1, 1998); *United States v. Juncal,* 1998 WL 525800, (S.D.N.Y. Aug.20, 1998); *United States v. Gabourel,* 9 F.Supp.2d 1246 (D.Col.1998); *United States v. Guillaume,* 13 F.Supp.2d 1331 (S.D.Fla,1998); *United States v. Eisenhardt,* 10 F.Supp.2d. 521 (D.Md.1998); *United States v. Reid,* 19 F.Supp.2d 534 (E.D.Va.1998); and *United States v. Arana,* 18 F.Supp.2d 715 (E.D.Mich. 1998).

**9.** I am advised by the Assistant Unites States Attorney that two judges in this District have denied *"Singleton"* motions from the bench, but no judge in the First Circuit has yet published an opinion in response to *Singleton.*

**10.** Because of the significance of the issue in general and on the facts of this case, I issued a procedural order on October 9, 1998, requiring both sides to address not only whether plea bargains for testimony violate § 201(c)(2), but how the other things of value in this case should be dealt with under § 201(c)(2).

**11.** Illicit drug trafficking is an "aggravated felony" as defined by 8 U.S.C. § 1101(a)(43)(B) (Supp.1998), and an alien "convicted of an aggravated felony at any time after admission is deportable" under 8 U.S.C. § 1227(a)(2)(A)(iii) (Supp.1998).

**12.** of the cases mentioned in footnote 7, only *Revis,* 22 F.Supp.2d at 1254, made positive note of the fact that § 201(c)(2) applies to prosecutors, even if not for plea bargains. Many of the other cases made the overly broad generalization that § 201(c)(2) does not apply to the government at all. *See e.g. White,* 27 F.Supp.2d at 649 ("the sovereign exclusion canons set out in *Nardone v. United States,*

In this regard, I agree with the concurrence in *Singleton II* which held that prosecutors generally fit within § 201(c)(2)'s prohibitions. To the extent that prosecutors operate outside of the various statutes which "limit the 'something of value' that the government may offer, and detail the roles of both the prosecution and the courts in determining sentences, providing immunity, and granting other forms of assistance," 165 F.3d 1297, 1306 (Lucero, J., concurring), their behavior could be at risk for § 201(c)(2) prosecution. Indeed, presuming that prosecutors are covered by § 201(c)(2) is essential to respecting Justice Brandeis' admonition: "Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

In contrast, the majority in *Singleton II* suggested that prosecutors are not covered by § 201(c)(2) at all when they function like the sovereign—offering promises of non-prosecution, or a motion for leniency under 18 U.S.C. § 3553(e), but are covered if they "step beyond the limits of [their office] to make an offer to a witness other than one traditionally exercised by the sovereign," 165 F.3d 1297, 1302. This functional test, as the *Singleton II* concurrence noted, "creates a conceptually messy legal regime for handling the case of the errant United States Attorney 'who offers something other than a concession normally granted by the government.'" *Id.* at 1307.

Indeed the facts of this case suggest that what is sovereign-like and what is not may be difficult to determine. For example, the CW got immigration assistance, tax preparation assistance, and subsidized housing (even when the government knew she had received over $105,000 in cash payments over a period of over six years.), benefits which, depending upon the circumstances, could be sovereign-like.

As a general matter, therefore, I hold that prosecutors may not give "anything of value" to a witness, "for or because of" that witness' testimony. When a prosecutor (or his or her agents) pays a witness cash, then looks the other way when the witness lives in subsidized housing, gives immigration assistance, provides an accountant for him or her, etc., the prosecutor's conduct presumptively fits under § 201(c)(2). As to these "things of value," the prosecutor stands precisely in the same shoes as a defense lawyer. The only question is a factual one: Were the benefits conferred "for or because of" testimony, or for some distinct and lawful reason?

An evidentiary hearing was held on this issue over two days. Counsel were given an opportunity to call witnesses and cross-examine their opponents' witnesses. Information concerning the arrangements that had been made with the CW was disclosed. No objections were raised either with respect to the information that the government had provided, or access to potential government witnesses. While a number of questions were raised, in the final analysis, defense counsel did little to challenge the government's justifications for the payments.

Based on the limited record before me, I find that the government's conduct did not violate § 201(c)(2). Medina's motion (# 44) is therefore **DENIED**.

## I. FACTUAL BACKGROUND

### A. The CW's Role in the Arrest of Medina

The CW has been central to the investigation of Medina and, based on the gov-

302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), apply to exclude the government from the provisions of 18 U.S.C. § 201(c)(2)"); *Nieves*, 1998 WL 740835 at *1 (" § 201(c)(2) does not apply to the government because the government is not expressly included in its scope."); *Juncal*, 1998 WL 525800 at *1

(" § 201(c)(2) does not specifically apply to the Government."); *Reid*, 19 F.Supp.2d at 538 ("a reading of Section 201(c)(2) that includes government attorneys would work [sic] 'obvious absurdity.' "); *Arana*, 18 F.Supp.2d at 719 ("Section 210(c)(2) should be construed not to cover federal prosecutors").

ernment's representations, will be central to the trial.[13] The government anticipates that the evidence at trial will establish the CW received approximately 125 grams of cocaine from Medina on October 1, 1997, and October 9, 1997. Both deals, the government claims, had previously been negotiated by the CW with Nicander Serna, one of Medina's co-defendants. Moreover, the telephone calls leading up to the distributions, as well as the actual meetings where the distributions took place, were consensually recorded by the CW.

The government also claims that Alberto Tapias ("Tapias") and Alex Posada ("Posada"), the other two co-defendants in the case against Medina, had made arrangements to sell six kilograms of cocaine to the CW, which was allegedly distributed with Medina's help on January 7, 1998. On the day of the distribution, the CW entered a restaurant, met with Tapias and Posada, and observed Posada carry a cardboard box out and place it in Tapias' car. After Posada reentered the restaurant, the CW, Posada, and Tapias exited the restaurant and went to Tapias' car. The CW saw the box inside and confirmed that it seemed to contain about six kilograms of cocaine. Tapias and Posada then followed the CW out of the parking lot to another location where the money for the cocaine was supposed to be located. En route, Tapias and Posada were arrested and the cocaine was recovered from Tapias' car. Posada then agreed to cooperate with the Drug Enforcement Administration ("DEA") agents, and advised them that

Medina had delivered the cocaine to the restaurant earlier that day. A short while later Medina was arrested.

Edward Mastrocola ("Mastrocola"), an agent for the DEA, directed the CW throughout the investigation of Medina and his co-defendants. According to Mastrocola, the CW made between 50 and 60 recordings of meetings with the targets of this investigation.[14] These meetings were often arranged on short notice. Each meeting was preceded by a meeting with Mastrocola, to discuss where, when, and with whom to meet, with what aim. On those days, the CW would typically spend from several hours to the whole day and into the night working on the case. There would typically be a follow-up meeting with Mastrocola, to discuss what transpired at the meeting with the targets and to write a report. In addition, Mastrocola and the CW had independent meetings and telephone conversations to discuss the investigation.

### B. *CW's History with the Government*

#### 1. *The Plea Agreement*

The CW was arrested in 1991 and charged with possession with intent to distribute ten kilograms of cocaine. In her plea agreement with the U.S. Attorney's office, entered into in May of 1992, she agreed to plead guilty to one count of conspiracy to possess with intent to distribute more than five kilograms of cocaine.[15]

---

13. The indictment charges Medina with four drug related counts: Count one charges conspiracy to distribute, and to possess with intent to distribute, cocaine, between on or about September 29, 1997 and January 7, 1998, in violation of 21 U.S.C. §§ 846 and 841(a)(1); counts two through four charge distributing, and possessing with intent to distribute, cocaine on October 1, 1997, October 9, 1997, and January 7, 1998, respectively, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

14. On November 10, 1998, the government supplemented the record on this score. It disclosed that the CW made approximately

100 tape recordings in connection with this investigation.

15. The penalty for conspiracy to possess with intent to distribute five kilograms or more of cocaine is set at a mandatory minimum term of imprisonment of not less than ten years. 21 U.S.C. §§ 841(b) and 846. The sentencing court may depart below the mandatory minimum, however, if the prosecutor moved for leniency based on substantial assistance. *See* Application Note 7 to the U.S.S.G. § 2D1.1: "Where a mandatory (statutory) minimum sentence applies, this mandatory minimum sentence may be 'waived' and a lower sentence imposed (including a sentence below

In addition, the CW agreed to cooperate with the government. Her cooperation was to include information and debriefing, investigative work, and possibly testimony. The agreement provides, *inter alia*, that she will "cooperate with the DEA and any law enforcement agencies," and will "attend meetings as requested, *testify truthfully in any court proceeding*, follow specific instructions of criminal investigators, and disclose any documents or other evidence requested by law enforcement." [16] (emphasis added).

In return for her full cooperation, the government agreed not to prosecute her for any further crimes except criminal tax violations related to the charge of conspiracy to which she pled guilty, and only to the extent that her participation was revealed by the date of the agreement. If she complied with the agreement, no information provided by her or derived therefrom "will be used against her in any criminal tax prosecution." In addition, the plea agreement obligates the U.S. Attorney's office to file a motion pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) advising the sentencing judge of the CW's substantial assistance if she complies with all of her obligations.

Significantly, the CW has not been sentenced, although she pled guilty to conspiracy almost seven years ago. The government suggests that sentencing has been delayed in order to make certain that it reflects the full extent of her cooperation,

including her truthful testimony. If, at the end of her service, she has provided substantial assistance to the government, it can move to avoid the mandatory minimum sentence otherwise associated with conspiracy to distribute five kilograms or more of cocaine.

The defense suggests a more sinister motive: That sentencing has been delayed in this case, as in so many others, in order to keep the CW in a position where the government can put pressure on her to testify, should her testimony ever be called for, in a fashion consistent with the government's expectations.

### 2. *The DEA Agreement*

Around the same time the CW signed the plea agreement, she started to work for the DEA, as contemplated by the plea agreement. She signed a form on which she agreed that "the information [she] provide[s] may be used in a criminal proceeding, and [she] may be called upon to testify to such information in a court of law...."

At least three DEA agents have worked with her since she signed up, on cases other than the instant one.[17] Mastrocola worked with this CW on three or four different investigations over the past five years, other than the Medina investigation. While he claimed that he knew nothing about any arrangements for the CW's testimony,[18] that is not credible in the light of the DEA form and what he must have

---

the applicable guideline range), as provided in 28 U.S.C. § 994(n), by reason of a defendant's 'substantial assistance in the investigation or prosecution of another person who has committed an offense.' *See* § 5K1.1 (Substantial Assistance to Authorities)." *See also Melendez v. United States*, 518 U.S. 120, 116 S.Ct. 2057, 135 L.Ed.2d 427 (1996) (discussing the relationship between departures from the Sentencing Guidelines and from statutory mandatory minimum sentences).

**16.** The full list of potential charges against the CW has not been disclosed.

**17.** Other agents, out of the Boston area, were using the CW.

**18.** Mastrocola testified that he was not working with her when she was signed up by the DEA in 1992, and that he had no involvement with the drafting of her plea agreement. Indeed, Mastrocola testified that he had not even seen the plea agreement until the hearing held in this Court in October 1998. Moreover, he testified that he has only spoken to an Assistant U.S. Attorney handling the CW's case two or three times over the two years or more since the case against Medina started, and that when he last spoke to the U.S. Attorney handling the CW's case, the topic of a 5K1.1 reduction did not come up.

understood standard practice to be. Plainly, he knew that testimony was a possibility, as it typically is.

### 3. Cash Payments of Over $105,000

From 1992 through January 7, 1997, the date of Medina's arrest, the CW received nearly $105,000. The total breaks down into $70,330 for her information, and $34,367 for expenses. Of the money the CW received for information, $36,380 was for information received from May 1996 until Medina's arrest, the period of time during which she was working on the Medina case.[19] Of the money the CW received for expenses, $24,867 was received from May 1996 until Medina's arrest.

Significantly, all of the payments were made in cash, making it that much harder to determine exactly what was given when. The only record of the payments is on DEA voucher forms that were supposed to accompany each payment. The voucher forms introduced into the record indicate that the payments were for "participation in undercover role," or "reimbursement of expenses."

Given the extent of the CW's obligations to the DEA—attendance at meetings, sometimes with little or no notice, and investigations going on all day and into the night—the amounts given for her participation in an undercover role seem to fit the work involved. Moreover, the expenses covered such things as rental of a car and a cellular telephone, which the CW had use of throughout most if not all of the investigation of Medina.[20]

But the payments to the CW did not stop upon Medina's arrest. On January 13, the CW received $900 for use of a car, $150 for a cell phone, and $1,000 to pay for tax help; on January 22, she received $150 for information and expenses; on January 29, she received $2,000, partly as a "reward" and partly for expenses; on February 18, she received another $900 for use of a car, and $100 for a cell phone; and finally, on April 3, she received a "reward" of $2,000.[21] Thus, the CW received a total of an additional $8,200, some or all of which was connected with her work related to Medina.

Significantly, the nature and purpose of the "reward" payments, one of which was made almost three months after Medina's arrest, were not explored by Medina's counsel.[22] For example, the exchange regarding the April 3 payment went as follows:

> Counsel: Now, drawing your attention to the final—the final document in this packet, this document is dated April 3.
>
> Mastrocola: Yes, sir.
>
> C: And again, it is a $2,000 cash payment?
>
> M: That's correct.
>
> C: To this witness?
>
> M: That's correct.
>
> C: And it is for a reward?
>
> M: That's correct.

Counsel made no attempt to push Mastrocola on the possibility that these rewards might have been linked to testimony the CW might be called upon to give at trial. Most significantly, he did not seek testimony from the CW herself—what her understanding of the arrangements was, and

---

**19.** While the Medina indictment alleges criminal activity in October of 1997, the CW began the investigation in the spring of 1996.

**20.** As for the CW's personal use of the cell phone and car, Mastrocola said that "he did not believe that there would be any objections."

**21.** These figures are derived from DEA vouchers that Medina introduced into evidence.

**22.** He did not explore whether the payments were reimbursing the CW for out-of-pocket expenses, or were payments for ongoing use, and if the latter, whether that use was justified by what Mastrocola testified was the CW's ongoing work with the DEA in other cases.

what she was doing when the payments were given.

Rather, the payments were characterized by Mastrocola and that characterization was essentially unrebutted. Mastrocola insisted that the CW would not receive any more money if she were called as a witness in this case. Nor would she have to return any of the money if she were not called to testify as a witness.

#### 4. Other benefits

Money was not the only thing the DEA provided to the CW. At DEA expense, the CW met with a tax preparer, paid for by the DEA, to file back income tax returns for 1992 through 1997.[23] In addition, the DEA provided assistance in applying for an "S–Visa," which is of particular significance given that her guilty plea to a drug offense made her immediately deportable. Moreover, during the period of CW's cooperation, several members of her family were granted asylum for their protection.

Finally, notwithstanding the steady stream of money from the government, the CW continued to live in subsidized housing. In addition, CW's minor children receive approximately $271 per month in food stamps, cash payments of $550 per month and Medicaid benefits. None of the income she has received from the DEA was disclosed to any of the government agencies involved in these programs.

## II. ISSUES OF LAW

In order to properly deal with Medina's motion to suppress the testimony of the CW on the grounds that the government violated § 201(c)(2), the following questions must be addressed: (1) Does § 201(c)(2) apply to prosecutors at all? (2) If so, would a plea agreement offering immunized testimony, limited prosecution, and a motion for leniency in exchange for testimony violate § 201(c)(2)? (3) Would cash rewards and other things of value in exchange for testimony violate § 201(c)(2)? (4) And, who has the burden of showing that something of value was actually given for or because of testimony in violation of § 201(c)(2)?

### A. Is the Government Covered by § 201(c)(2)?

▮ Section 201(c)(2) provides that "*whoever* ... directly or indirectly, gives, offers or promises anything of value to any person, for or because of [his or her] testimony under oath ..." (emphasis added) shall be fined or imprisoned. In interpreting this text, one must start with and give great weight to its plain meaning.[24] And the plain meaning of "whoever" includes the government.[25]

---

**23.** As noted above, the DEA paid $1,000 for this service on January 13, 1998.

**24.** *See e.g. Ardestani v. INS*, 502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) (the language of the statute "must ordinarily be regarded as conclusive"); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) ("The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances,' when a contrary legislative intent is clearly expressed"); *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 118 S.Ct. 838, 841, 139 L.Ed.2d 849 (1998) (absent clearly expressed contrary legislative intent, "we are bound to take Congress at its word").

**25.** Inexplicably, the majority opinion in *Singleton II* essentially denies this: "The word 'whoever' connotes a being. The United States is an inanimate entity, not a being. The word 'whatever' is used commonly to refer to an inanimate object." 165 F.3d 1297, 1999 WL 6469, at *3 (internal citations omitted). Unintentionally, I assume, the majority thereby exempts from the coverage of 201(c)(2) corporations, associations, and all other "artificial persons" which are as much inanimate entities as the United States. *See also* Judge Lucero's concurrence, arguing that the majority's reading of "whoever" "cannot be reconciled with *Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), which holds that government agents are liable under wiretapping provisions of the Federal Communications Act. Like the statute at issue here, that under review in Nardone uses a term of general

■ But the plain meaning of "whoever" is only the starting point of the analysis.[26] There is a canon of construction according to which "laws which tend to restrain or diminish the powers, rights, or interests of the sovereign do not apply to the government or affect governmental rights unless the text expressly includes the government." *United States v. Revis*, 22 F.Supp.2d 1242, 1254 (N.D.Okla.1998) (citing to *United States v. Herron*, 20 Wall. 251, 87 U.S. 251, 256, 22 L.Ed. 275 (1873)).

In *Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), the Supreme Court addressed a similar question, whether to apply a statute that allowed "no person" to tap phones to government agents. *Nardone* suggested that there are two classes of cases in which this canon, excluding the government from coverage, has been applied. The first is "where an act, if not so limited, would deprive the sovereign of a recognized or established prerogative title or interest...." *Id.* at 383–84, 58 S.Ct. 275. The second class "is where a reading which would include such officers would work an obvious absurdity as, for example, the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm." *Id.*[27]

The question arises in a case like this: What is the result if the *Nardone* analysis yields a hybrid result in which the statute at issue applies to government actors in some range of governmental actions, but not others? The most sensible answer is

that the statute applies to those government actors, with exceptions. *See Revis*, 22 F.Supp.2d at 1254 ("[O]nce it is conceded that the statute covers such government conduct [giving bribes or gratuities to witnesses for or because of their testimony] in at least one instance, the argument that the statute cannot apply to the government at all is lost.")

This case presents a hybrid. It involves not only leniency-for-testimony deals, but also outright payments to a witness. As described below, I find that it would not deprive the sovereign of a recognized prerogative, title, or interest, nor would it work an obvious absurdity, to bar prosecutors from giving witnesses money simply for their testimony. Indeed, just the opposite; § 201(c)(2) is meant to protect the reliability of testimony by criminalizing the giving of gratuities that have an obvious potential to corrupt testimony. Prosecutors giving gratuities have the same potential to corrupt testimony as anyone else (if not more, given their other powers to dispense things of value to cooperating witnesses). There is no reason to impute to Congress the unwise and irrational intention of giving prosecutors a blanket exemption from this law.

Moreover, there is a countervailing canon of construction, ignored by most courts discussing *Singleton I*, including the majority in *Singleton II*, that there are exceptions to the rule that the government is not covered by statutes unless

applicability—'no person'—to encompass the class of persons subject to the law." 165 F.3d 1297, 1303.

**26.** "The Dictionary Act," 1 U.S.C. § 1, suggests the opposite. It defines "whoever" in a manner that does not seem to include the federal government: "[T]he words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." *See United States v. Abraham*, 1998 WL 806179, *3 (D.N.J. Nov.23, 1998); *United States v. Mine Workers of America*, 330 U.S. 258, 275, 67 S.Ct. 677, 91 L.Ed. 884 (1947) (interpreting a statute with the word "person" not to apply to the government be-

cause the government was left out of the list in the Dictionary Act, § 1).

**27.** The Sixth Circuit, in *Ware*, suggests that there might be other classes of cases in which the government is not covered, as well. The court in *Ware* points out that "[a]ll the Court in *Nardone* stated was that the canon 'has been applied' to cases which fall into two classes. Nothing in that decision or any other Supreme Court decision 'limits' application of the canon to only the two classes of cases mentioned." 161 F.3d at 419 n. 1. Nevertheless, no other class of cases has been argued before me.

expressly named, "where the statute is passed for the general advancement of learning, morality, and justice, or to prevent *fraud,* injury, and wrong." *United States v. Herron,* 20 Wall. 251, 87 U.S. 251, 255, 22 L.Ed. 275 (1873) (emphasis added). Section 201(c)(2) is designed to prevent witnesses from being induced to give fraudulent or biased testimony because of gratuities they were promised or received. As such, this canon implies that it does cover the government and its agents.

Thus, I do not agree with the courts that, having found prosecutors are not covered in some cases, then extend the point by saying that prosecutors are not covered at all, even for giving cash payments for testimony.[28] To do so is, to use the vernacular, "to throw the baby out with the bath-water."

### B. *Are Plea Agreements Offering Immunized Testimony, Limited Prosecution, and a Motion for Leniency in Exchange for Testimony Prohibited by § 201(c)(2)?*

■ Along with the court in *Singleton II* and the great majority of courts which have responded to *Singleton I,* I conclude that the government can offer immunized testimony, limited prosecution, and a motion for leniency in exchange for testimony in a plea agreement. First, under the *Nardone* test, the government should not be covered by § 201(c)(2) insofar as it offers these things, even in exchange for testimony. Second, there are a number of statutes more specific than 201(c)(2) that empower the government to offer these things to a defendant to seek to ensure, among other things, that the defendant will become a witness for the government.

#### 1. *The Nardone Test*

The first prong of the *Nardone* test asks whether reading a statute to apply to the government would deprive the sovereign of a recognized or established prerogative, title, or interest. The nearly universal consensus among the courts that have responded to *Singleton I* is that it would do just that to read § 201(c)(2) to prohibit federal prosecutors from offering immunized testimony, limited prosecution, and a motion for leniency for testimony—what the majority in *Singleton II* called the "traditional" elements of a government's offer in a plea bargain. 165 F.3d 1297, 1302.

Courts responding to *Singleton I* have generally focused their attention on leniency, the only part of the plea-bargain that *Singleton I* found illegal. In that area, they have pointed out that "[t]he prosecutorial prerogative to recommend leniency in exchange for testimony dates back to the common law in England and has been recognized and approved by Congress, the courts, and the Sentencing Commission of the United States." *United States v. Ware,* 161 F.3d 414, 419 (6th Cir.1998). *See also United States v. Cervantes–Pacheco,* 826 F.2d 310, 315 (5th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988) ("No practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence.").

Immunity, however, also has a grand historic pedigree. As the Supreme Court noted in *Kastigar v. United States,* 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), "Immunity statutes ... have historical roots deep in Anglo–American jurisprudence...." "Soon after the privilege against compulsory self-incrimination became firmly established in law, it was recognized that the privilege did not apply when immunity, or 'indemnity,' in the En-

---

28. *See* footnote 11, *supra.*

glish usage, had been granted." *Id.* at n. 13.[29]

Likewise, the decision to drop charges as part of a plea bargain is part of the well entrenched practice of prosecutorial discretion. *See McCleskey v. Kemp*, 481 U.S. 279, 311–12, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) ("the capacity of prosecutorial discretion to provide individualized justice is 'firmly entrenched in American law.' 2 W. LaFave & D. Israel, *Criminal Procedure* § 13.2(a), p. 160 (1984). As we have noted, a prosecutor can decline to charge, offer a plea bargain . . .").

Of course, as the court in *Revis* noted: "[T]here is no authority that supports the claim that a long standing practice, if contrary to the law, should nevertheless be upheld." 22 F.Supp.2d at 1248.[30] But where the question is whether a law makes a practice illegal, indeed criminal, then the fact that a practice is of longstanding duration surely weighs against interpreting the law as changing the practice, unless Congress has made clear its intention to make such a change. *See Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 521, 109 S.Ct. 1981, 104 L.Ed.2d 557 ("A party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change"). No such clear expression of Congressional intention to change settled law is to be found in either the text or legislative history of § 201(c)(2).

The second prong, that coverage of prosecutors making "normal" plea agreements would work an "obvious absurdity," also seems to most courts to be clear. *See e.g. United States v. Clark*, 29 F.Supp.2d 869 (S.D.Ohio 1998) (without testimony obtained through plea agreements, "the government would be unable to enforce drug laws, prosecute organized crime under RICO, or otherwise effectively proceed in the thousands of cases each year in which it relies on witnesses who testify in return for leniency."); *U.S. v. Abraham*, 29 F.Supp.2d 206, 211 (D.N.J.1998) ("Many offenses are 'of such a character that the only persons capable of giving useful testimony are those implicated in the crime.' ") (citing *Kastigar*, 406 U.S. at 446, 92 S.Ct. 1653).

Moreover, courts have effectively ratified these practices in decision after decision. While recognizing that plea bargains exchanging testimony for leniency, immunity, and no prosecution are vulnerable to abuse, all courts have concluded that there are mechanisms—although none derived from a criminal statute—to control them. For example, the Fifth Circuit, in *Cervantes–Pacheco* held, without examining § 201(c)(2), that the benefits of a reduced sentence are an inducement to lie, but that "[a]dequate rules are in place to protect against abuses." 826 F.2d at 315. These rules are:

> The government of course must not deliberately use perjured testimony or encourage the use of perjured testimony. The government must also make a complete and timely disclosure to the accused of the fee arrangement it has made with the informant in accordance with *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The accused must have an adequate opportunity to cross-examine the informant and government agents about any agreement to compensate the witness. Finally, the trial court should give a careful instruction to the jury pointing out the suspect credibility of a fact wit-

---

**29.** *Kastigar* notes that the early British immunity statutes date as least as far back as 1710. *See also* Michael Gilbert, *the Future of Congressional Use Immunity after United States v. North*, 30 Am.Crim.L.Rev. 417, 418 (1993) (discussing the history of Congressional immunity statutes).

**30.** The Court cited to the argument by John W. Davis to the United States Supreme Court on behalf of the South Carolina school system: Racial segregation, Davis contended, was a practice so longstanding as to eschew any challenges to it. Needless to say, that argument lost.

ness who has been compensated for his testimony.

*Id.* at 315–16 (internal citations omitted). *See also United States v. Dailey,* 759 F.2d 192, 196 (1st Cir.1985) (holding that plea agreements with testifying accomplices did not create such a risk of perjury that the defendant's due process rights were violated by the admission of the accomplices' testimony at trial, and noting that "[l]ong ago the courts rejected the notion that the testimony of co-defendants and other interested witnesses was so likely to be unreliable that it should be excluded."); and *United States v. Cresta,* 825 F.2d 538, 545–46 (1st Cir.1987) (holding, without examining § 201(c)(2), that a "contingency fee arrangement is not per se impermissible," and relying on the safeguards of cross-examination and jury instruction to "ferret out·any false testimony").

While I have substantial concerns as to whether the practice of exchanging immunity, the promise of no prosecution, and motions for leniency for testimony is "adequately" controlled by disclosure, cross-examination, and jury instructions, I cannot deny that all courts considering the matter have so held.

## 2. *Statutory Foundation of Motions for Leniency*

To further support the practices of exchanging motions for leniency and immunity for testimony, the government relies on the canon of statutory construction that requires that a specific statute controls a more general provision. *See Singleton II,* 165 F.3d 1297, 1305 (Lucero, J., concurring) ("a specific statute controls over a general") (citing 2B Norman, J. Singer, *Sutherland on Statutes and Statutory*

*Construction* § 51.05, at 174 (5th ed.1992)). *See also Ware,* 161 F.3d at 423 (citing *HCSC–Laundry v. United States,* 450 U.S. 1, 6, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981) and *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) for the canon of statutory construction).

I reject as totally implausible the suggestion made by one court the followed *Singleton I,* that § 201(c)(2), dealing with gratuities in general, is more specific than the statutes dealing directly with leniency in exchange for substantial assistance. *See United States v. Lowery,* 15 F.Supp.2d 1348, 1356 (S.D.Fla.1998) ("While Sections 3553(e) and 5K1.1 and Rule 35 contemplate the more general 'substantial assistance,' which may include testimony, Section 201(c)(2) applies solely to testimony."). And I agree with those courts that have found the *Singleton I* panel's attempt to avoid a conflict implausible. *See Singleton II,* 165 F.3d 1297, 1303 (Lucero, J., concurring) (declining to join the dissent "[b]ecause [a number of] specific statutes are in conflict with the general prohibitions of § 201(c)(2)"). *See also Revis,* 22 F.Supp.2d at 1259–61. Title 18 U.S.C. § 3553(e), which addresses prosecutor's motions for leniency, plainly includes departures because of testimony, and not simply information. The statute describes substantial assistance in the investigation *or prosecution* of another person. The most important way a witness can assist in the prosecution of another is by testifying. This is recognized in U.S.S.G. § 5K1.1(a)(2), which interprets substantial assistance to include "the truthfulness, completeness, and reliability of any information *or testimony* provided by the defendant." *Id.* (emphasis added).[31]

---

31. The power to grant immunity is grounded in 18 U.S.C. §§ 6001–6005. *Singleton I* held that these sections are compatible with § 201(c)(2) because they merely allow the government to "remove[ ] the witness's testimonial privilege so the ordinary compulsion may be brought to bear to require the witness to testify." 144 F.3d at 1348. In other words, immunity is not valuable to a witness; rather, it opens a witness up to compulsion. Therefore, it is not a thing of value under § 201(c)(2). While I agree with the result, that § 201(c)(2) does not prevent the government from exchanging immunity for testimony, I disagree with this treatment of the topic. It is, as one court put it, "strained." *United States v. Abraham,* 1998 WL 806179 at *6 ("The government 'benefits' a defendant every

## C. *Is Giving Money and Other Things of Value in Exchange for Testimony Prohibited by § 201(c)(2)?*

### 1. *Nardone*

■ Unlike leniency, there is no long-standing, well recognized, and deeply established governmental prerogative to give money or other valuable things to witnesses for their testimony. And there is no absurdity in denying prosecutors the right to do so. Far from it.

While it is true that witnesses can receive money *before* taking the stand, the cases which discuss this involve the payment of money mainly for the information the witnesses provided, not for the testimony alone. *See e.g. Cresta,* 825 F.2d at 545 (a witness who had received $17,000 for information from the DEA, and $36,000 under the Witness Protection Program, and who expected to receive another $50,000 from the sale of assets seized on the basis of information he provided, could testify if the proper safeguards were used). *See also Dailey,* 759 F.2d at 199 ("[C]ourts have allowed the testimony of informants who agree to work undercover and testify in exchange for either leniency, money or both."); *U.S. v. Persico,* 832 F.2d 705, 717 (2d Cir.1987) (holding that the credibility of an FBI informant who received a monthly salary for her information, and relocation expenses, including a lump sum payment after all the trials were done, was for the jury to evaluate); *Cervantes–Pacheco,* 826 F.2d at 315 (5th Circuit holding that "an informant, who is promised a contingent fee by the government" to "infiltrate, gather information for intelligence and report," as well as testify, "is not disqualified from testifying in a federal criminal trial."); and *United States v. Jones,* 575 F.2d 81, 86 (6th Cir.1978) (holding that there is no need to exclude the testimony of an informant paid under a contingent fee agreement for information that lead to a conviction).[32]

The distinction between information and testimony is an important one, as the First Circuit recognized in *United States v. Innamorati,* 996 F.2d 456 (1st Cir.1993). *Innamorati* involved testimony by a key witness who received $250,000 from the government prior to trial as a DEA award for his instrumental role in the seizure of assets. The court acknowledged that "such immense payments are troubling." *Id.,* 996 F.2d at 482. It went on to say that "payments may be for 'information,' rather than for later testimony or convictions, but the steps are linked and the inducement to testify in accordance with prior reports is obvious." *Id.* The court thus acknowledged the importance of not paying for testimony per se, even while acknowledging that a payment for information could also have an effect on testimony.

There is no tradition, then, of prosecutors having the authority to pay for testimony per se, any more than for defense lawyers.[33] There is instead a practice, again shared by defense lawyers, of paying

---

bit as much by moving for immunity pursuant to 18 U.S.C. § 6003 as it does in recommending a downward departure from the sentencing guideline range.") *See also Ware,* 161 F.3d at 422 n. 2. The reasons grants of immunity are not incompatible with § 201(c)(2) are essentially the same as for leniency: there is a long, well recognized and established history of immunizing witnesses for their testimony, and the specific statutes allowing the government to grant immunity for testimony control the more general prohibition in § 201(c)(2).

**32.** It is noteworthy that not one of these cases recognized or addressed § 201(c)(2).

**33.** The majority in *Singleton II* seems to come to the same conclusion in emphasizing that § 201(c)(2) "in no way permits an agent of the government to step beyond the limits of his or her office to make an offer to a witness other than one traditionally exercised by the sovereign," 165 F.3d 1297, 1302, and then going on to specify that "[i]t is inconceivable that any court would hold that a prosecutor who pays for the false testimony of a witness is carrying out an official function of the government." *Id.,* at 1302 n. 2. It is unclear, however, why the court used the example of paying for "false" testimony; § 201(c)(2) prohibits paying for testimony, true or false.

informants to gather information, even if that arrangement is also likely to result in testimony. In short, prosecutors can claim no special exemption to § 201(c)(2) under the first prong of *Nardone*.

Under the second prong of *Nardone*, whether the statute's application to prosecutors would yield absurd results, there can be no argument. It is not at all absurd for a statute to prohibit government from corrupting testimony by giving money that it would plainly be illegal for a defense counsel to give a witness. And what is true of money is true of other valuable things, such as the tax and immigration help given to the CW in this case. Such services have the same status as money, in contrast to the stuff of "traditional" plea agreements, under the *Nardone* test.

### 2. Statutes

The *Witness Relocation and Protection Act* 18 U.S.C. § 3521(b)(1) and (d)(1)(A) entitles the Attorney General, and through her the U.S. Attorneys, to bestow an extensive series of things of value upon witnesses or potential witnesses ostensibly in

exchange for their agreement to testify. But this Act is addressed to a very limited situation—witnesses facing serious threats if they testify. To meet this problem, prosecutors are authorized to give such witnesses and their immediate families a new location, set them up with a new identity, and offer them a laundry list of valuable things to minimize the risks they would otherwise face because of their testimony. This Act lacks the grand historic pedigree of offers of immunity and leniency, but insofar as it allows payment for testimony,[34] it provides a clear, specific, and limited exception to § 201(c)(2).

There are also various reward statutes, but all are concerned with rewarding information.[35] In effect, these statutes merely empower the government to do what the defense already could do: pay for information.

In sum, the government has two limited cards that the defense typically does not have: The ability to offer the normal perks of a plea bargain—immunity,[36] dropped charges, and motions for leniency—in exchange for testimony, and the ability to

---

**34.** It is not even clearly in conflict with § 201(c)(2). Like the statutes that allow payment for information, where testimony is anticipated, this statute can be viewed as allowing payment for safety, where testimony is anticipated. There is no indication that the statute allows for more payments (other than for expenses) to a witness the more he or she testifies.

**35.** *See* 18 U.S.C. § 3059B, authorizing the Attorney General to pay a reward "to any individual who assists the Department of Justice in performing its function"; 18 U.S.C. §§ 3071–3077, authorizing the Attorney General to reward individuals for information that leads to the arrest or conviction of anyone implicated in the commission of terrorism; 19 U.S.C. § 1619, authorizing the Secretary of the Treasury to pay up to $50,000 in reward for, among other things, "information concerning any fraud upon the customs revenue"; 21 U.S.C. § 881, authorizing the Attorney General to pay rewards of up to $100,000 for "information which leads to the arrest and conviction of a person who kills or kidnaps a Federal drug law enforcement agent"; 26

U.S.C. § 7623, authorizing the Secretary of the Treasury to pay rewards "for detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws"; and 28 U.S.C. § 524(c)(1)(C), authorizing the Attorney General to pay rewards "for information or assistance leading to a civil or criminal forfeiture."

**36.** The Third Circuit has held that a district court can use its inherent power to immunize defense witnesses under certain circumstances, when necessary to protect the "defendant's due process right to have exculpatory evidence presented to the jury." *See Government of Virgin Islands v. Smith*, 615 F.2d 964, 970 (3d Cir.1980). Other circuits have rejected *Smith* on this point. *See United States v. Turkish*, 623 F.2d 769 (2d Cir. 1980); *United States v. Hunter*, 672 F.2d 815, 818 (10th Cir.1982) (abrogation recognized on different grounds in *United States v. Call*, 129 F.3d 1402 (10th Cir.1997)); *Autry v. Estelle*, 706 F.2d 1394 (5th Cir.1983); *United States v. Pennell*, 737 F.2d 521 (6th Cir.1984); *United States v. Herrera–Medina*, 853 F.2d 564 (7th Cir.1988).

pay witnesses who are under threat through the Witness Protection Program. But it does not have the right to pay witnesses *for testimony.*

### D. Who Has the Burden of Showing That Something of Value Was Actually Given For or Because of Testimony in Violation of § 201(c)(2)?

■ If payments to a witness could fit within § 201(c)(2), depending on the facts, then who has the burden of proof? Does a defendant, making that accusation against the government, have to show by a preponderance of the evidence that the government acted in violation of § 201(c)(2)? Or, having made a *prima facie* showing, does the burden shift to the government to show that its agents did not violate § 201(c)(2)?

I hold for two reasons that the burden shifts to the government once a defendant makes a *prima facie* case of an exchange of something of value for or because of testimony. First, the exchange of anything of value for or because of testimony is obviously a disfavored proposition. Typically the law assigns the burden of proof on the party promoting the disfavored position. *See In the Matter of Regional Rail Reorganization Proceedings*, 421 F.Supp. 1061, 1073 (Regional Rail Reorg. Ct.1976) (assigning burden of proof to railroad because railroad's position with regard to pension plan was "disfavored" under the congressional purpose of protecting employees of bankrupt railroads); J. McCormick, *Handbook on the Law of Evidence* § 337 at 786–87 (2d ed. E. Cleary 1972); Leo P. Martinez, *Tax Collection and Populist Rhetoric: Shifting the Burden of Proof in Tax Cases*, 39 Hastings L.J. 239, 272 (1988) ("[P]ublic policy considerations affect the choice of method used in assigning the burden of proof to a party by favoring one party over another with respect to particular issues"). Second, the government has all the relevant information. It can produce the plea

agreements, the DEA payment schedules, the lists of expenses, and occasions in which a witness did work for the government, etc. Moreover, placing the burden of proof on the government is not onerous. It has to disclose much of this information anyway under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

### III. APPLICATION TO THE FACTS OF THIS CASE

Since prosecutors are exempt from § 201(c)(2) insofar as they offer immunity, no prosecution, and motions for leniency in exchange for testimony, the question before me is whether the money and services the DEA provided to the CW violated § 201(c)(2). The answer depends on whether there is sufficient evidence that these things were provided to the CW for or because of testimony she might give in this trial.

#### A. Meaning of "For or Because of"

■ Section 201 is divided generally into bribery prohibitions and gratuity prohibitions. The bribery prohibitions in § 201(b) require specific intent to corruptly influence or induce an official or witness. By contrast, the gratuity provisions, including § 201(c)(2), require neither corrupt intent nor the specific intent to influence or induce the witness. *Singleton I* held that 201(c)(2)'s " 'for or because of' merely requires that the promises be motivated by the testimony, even though the testimony might have been given without the promises." 144 F.3d at 1348. "Motivation," however, is not an easy concept to operationalize.

Section 201(c)(2) cannot make it illegal to give anything of value to a witness simply because testimony might eventually be desired, but is not the immediate reason for the exchange. Such an interpretation would make criminal the hiring by the defense of an investigator primarily to

gather documents or do surveillance, and possibly to testify—an absurd result.

As I noted in the preceding discussion of the application of § 201(c)(2) to money, there are both cases and statutes that allow money to be given to people for the information they provide, presumably even if they later become witnesses. In effect, since information and investigation are often linked to testimony, the law suggests that money can be given for testimony albeit indirectly. Whether the link between the testimony and the money is acceptable has to be determined on a case by case basis. *See Cresta*, 825 F.2d at 545 ("A contingent fee arrangement [paying a witness for information to which he or she will testify] is not per se impermissible; on a case by case basis varying factors determine whether the arrangement in question is permissible.") (citing to *Dailey* and *Williamson v. United States*, 311 F.2d 441 (5th Cir.1962)).[37]

The possibilities define a continuum: On one end are cases in which· § 201(c)(2) is not an issue, cases in which money is given purely for information, and testimony is in no way anticipated (for example, someone gives a tip where a wanted suspect is hiding, and is given a reward under 18 U.S.C. § 3059B; .he will not be called upon to testify because where the suspect is found is not relevant to proving the case against the defendant). On the other end are cases in which § 201(c)(2) would clearly be violated, in which money is given purely for testimony (for example, counsel gives a witness $1,000 shortly before taking the stand, which is more than it would take to pay the witness' expenses for taking the day to come to court). In between

are mixed cases, running from those where money is given for information and testimony is merely a foreseen possibility, to those where money is given both for information and for testimony.

This case falls in the middle category where fine attention to the facts makes all the difference between legality and illegality.

## B. *Whether the Government Has Met its Burden of Proving That Payments and Other Benefits Were Conferred for Information and Not for Testimony?*

■ The sum of money that the CW received, over $105,000, is a substantial sum, properly subject to· scrutiny. *See United States v. Garcia* 528 F.2d 580, 587 (5th Cir.1976) (payment of $31,675.75 in ' eighteen months did not of itself mandate reversal, but the amount did require scrutiny and created doubt "as to the propriety of the practice of so heavily subsidizing informants.") *See also United States v. Gray*, 626 F.2d at 494, 499 (5th Cir.1980).

The government insists that whatever benefits the CW received were for her considerable investigative work and related expenses, not for her testimony. The government contends that most of the money was for other investigations, unrelated to the instant case. Moreover, insofar as the money was for work in this case, it was for work in an undercover capacity, making contacts in the drug world, passing that information along, wearing a wire, exposing herself to danger, etc. Like a private investigator for the defense who tracks people down, obtains records, etc.,

**37.** In *Williamson*, the court disapproved of a contingency fee arrangement with a government witness to produce evidence against particular, named defendants as to crimes not yet committed. "Such an arrangement," the court noted, "might tend to a 'frame up,' or to cause an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit. The opportunities for abuse are too obvious to require elaboration." 311 F.2d at 444.

While the court did not cite § 201(c)(2) (which had been drafted that same year), its concerns overlap significantly with those reflected in the provision. To the extent *Williamson* can be read to prohibit contingent fee agreements per se, however, it has been overruled by *Cervantes–Pacheco* in the Fifth Circuit, and that limitation has been recognized by other cases, including *Cresta* and *Dailey* in the First Circuit.

the payments in the case, the government argues, were for information.

Further confirming that the payments were for information and not for testimony, the government cites the fact that the payments ended months before trial, a time when the government still had no reason to think it likely that the CW would have to testify. This argument is supported by *Innamorati,* which justified payments of $250,000 a few days before trial in part by noting that "the payment was completed several days prior to trial, and the payment was thus not directly dependent upon the result of [the witness'] testimony in court."[38]  996 F.2d at 482.

Nor is there anything necessarily inappropriate about reimbursing the CW for a car and cell phone that she would have needed to use to carry out her job as an undercover investigator.[39]  *See e.g. United States v. Carcaise,* 763 F.2d 1328, 1332 (11th Cir.1985) (payment of expenses is not contingent fee arrangement prohibited by *Williamson.*)  Again, the standard should be the rules applied to any investigator, government or defense. It is highly doubtful that a private attorney who paid a private investigator a similar figure for similar work would have any problem later putting that investigator on the stand because of § 201(c)(2).

Help with the CW's tax returns and help with her and her family's immigration problems are justified by the government as essential to assure her continued investigative work. The defendant did nothing to challenge this justification.

Having said all of that, I nevertheless find certain parts of this record troubling. A number of payments were made *after*

Medina's arrest, including the one on January 29, 1998, fairly close to Medina's arrest, and a second, months later, on April 3, 1998. While Mastrocola testified that both awards were for investigative activity and expenses, the investigative phase presumably ended with Medina's arrest.

The defense, however, has offered nothing to rebut the government's proof. The CW did not testify as to what her understanding of the payments was.[40]  No evidence keyed these payments to any significant events in the prosecution of Medina's case. Moreover, the government's claim that the payments were the CW's to keep regardless of whether she testified in the Medina case, and were given to her months in advance of any possible trial, is significant. Thus I find that the government has carried its burden. The record is wholly inadequate to conclude otherwise.

## IV. *CONCLUSION*

At this stage in this case, the government has shown by a preponderance of the evidence that it did not give anything to the CW in violation of § 201(c)(2). Therefore, Medina's motion to suppress the testimony of the CW [docket # 44] is **DENIED.**

**SO ORDERED.**

---

**38.**  I do not read the court to imply that timing settles the matter. Payment for testimony obviously could be completed before the testimony occurs. But timing can be relevant to assessing whether payment is primarily for testimony or primarily for information or services performed.

**39.**  To be sure, the amount, here approximately $25,000, could raise concerns. If those

expenses were accumulated too quickly, they would be suspect. These were concerns which the defense counsel did not raise.

**40.**  In *United States v. Shearer,* 794 F.2d 1545 (11th Cir.1986), for example, the informant testified concerning the fees he expected to receive and how they were calculated.